Good morning. I may please the Court. My name is Frank Weiss. I'm counsel for the appellant Stimson Lumber. The heart of this case relates to how to treat a settlement of a class action pending against Stimson alleging property damage caused by a defective four-stacks siding board manufactured by Stimson. In an effort to avoid coverage for the class settlement, the insurers rely heavily on an exclusion of their policies, which is known as the year of product exclusion. And what that does is exclude coverage for damage to Stimson's own product, in this case the siding board, the four-stacks. Because it's an exclusion to coverage, the burden to prove the applicability of the exclusion falls on the insurance companies. In this context, that means they need to be able to prove, to defeat summary judgment, that the undisputed facts establish that 100 percent of all the money paid to resolve these class actions was attributable to claims for damage to Stimson's own products, and none of it was attributable to claims for damage to other property. Because the law in Oregon has very well established that if a defective product damages some other property, that damage to the other property is covered. The insurers can't meet that burden and haven't on this record. The record establishes unequivocally that each of the class actions alleged both that the siding was defective and had to be replaced, but also that problems with the siding caused injury to other property. Don't we have to look at the settlement agreement to see what actually was covered? What actually, how the lawsuit was resolved and what damages were actually recognized by the parties in this? I don't think we can look to the complaint because the complaint doesn't tell us what the resolution was. I think I largely agree with you, although not entirely. The complaint frames what the allegations were against Stimson. The settlement agreement in its initial recitals recites what the claims are against Stimson, and those claims are both damage to the siding itself and damage to other property. What the settlement then does is broadly release 100 percent of all the claims, not just the claims for the replacement of the siding, but also the claims for damage to other property. But the critical part of the settlement agreement is what damages are covered, what the money is given for. What was the money specifically? You know, a lot of settlement agreements, you know, they cite globally. Here's what you get. Like, for instance, those airline settlements where they say that you were charged too much for a ticket and they give you 10 cents off the next time you fly. So it's exactly what was the remedy that was granted in the settlement agreement. But to me, that is crucial to determining what actually the parties agreed was covered or what the damages were. Well, I think you've teed up the issue nicely. And I think that that's not ñ it's a distraction, I think, that there is a formula adopted in the settlement agreement for distributing the settlement funds. There is no formula? No, I think it's a distraction that there was a formula there. The settlement agreement could have also been written as Stimson will pay $50 million to settle all claims as opposed to Stimson will pay $50 million to settle all claims. But we're stuck with the record the way it is. Correct. We're trying to figure out from the record what actually ñ whether or not there were covered claims that were ñ that damages covered. And what the case law says, and probably the most apt case, and it's a statement in that case, I'm not sure it was precisely cited in the paper, so I'm going to make sure I've emphasized it, is the ABT case out of the Fourth Circuit from two years ago. And that case was remarkably similar to this one in that there was a settlement of all claims against a siting manufacturer. And as part of the settlement agreement, there was a formula that allocated the payments, and it was based on the replacement cost of the siting. And in footnote 29 in that decision, the Fourth Circuit addressed precisely the issue that Your Honor is raising, which is do you just look at the methodology for making the payment, or do you look beyond that? And what the Fourth Circuit concluded was that in doing a post-settlement judicial assessment of coverage, that what you look at is what underlying claims were settled, not necessarily the methodology for making the settlement payments. Another case that we cited in our paper, which is exactly what we're saying here, you have to look at what Stimson bought with that settlement agreement, not how you figured out how much they paid. And what they bought is a complete release for all claims. Well, let's just say that – let's forget that we have a class action settlement here, and let's just assume that there was a consumer who was upset with the siting, the siting deteriorated. Sure. And, you know, went to trial, or even they settled just an individual claim. And they only paid out for – let's just say they replaced the siting and the repair and cost of removing the siting and restoring it. Would there be insurance coverage for that? If the claim was only that the only damage was to the siting, and the settlement was only to settle just that one claim that was the only claim in existence, I believe no. No. Okay. So if you go to the settlement agreement, I think it's paragraph 5.3a. It says, in order for an eligible claimant to receive compensation for unreimbursed expenditures described in one of the subsections, such claimant must provide proof satisfactory to the claims administrator of the following facts. And it goes through. The siting, which is the subject of any such claim, was Stimson's forced tax. That the Stimson fore-tax siting materials, which are the subject of such claim, were damaged. That the Stimson forced tax siting materials, which are the subject of such claim, were repaired or replaced. And the cost of any such repair or replacement work. But that's all that was paid out. If that's the reason the funds were paid out for, why is there – why would you be able to turn this over to the insurance company and say, pay it? Two responses. One is, it's not surprising that the settlement agreement requires it to be proof that there was damage to the siting. Because if the siting didn't have any problems, then Stimson wouldn't have any responsibility for either the siting or for the damage the siting failures caused. So a predicate to Stimson being liable at all is that it supplied siting and it failed. So the presence of that provision doesn't prove anything. I think what's important is what's said right up front, which is this is a settlement of all the claims in reciting the presence of – So could a claimant under this policy, under this settlement clause, if he said, oh, by the way, this siting also damaged all the studs and the internal walls, and in order to fix this, I had to knock all that out. We had to rip all that out and we had to repair that and replace that. If he showed that, if the claimant submitted that kind of proof, in addition with these basic items I just went over with, was he entitled to be paid for that under the settlement agreement? Well, what he did in the settlement agreement was waived those claims. Waived those claims. If you waived those claims, why didn't Stimson waive those claims? Well, again, look at it another way. There's two helpful ways of looking at this that make more sense to me. One is what Stimson did here is compromise its potential liability, and what they came up with is a claims program to meet out that compromise that was arrived upon, and the claims formula basically calls for replacement of the siting. Now, if all Stimson thought it was buying was a settlement of an obligation to replace the siting, they didn't get a very good deal if the settlement requires them to pay 100 percent of the replacement cost of the siting. Essentially, the settlement then would have achieved nothing more than Stimson agreeing to complete liability, but that's not what they got. What they got is a waiver and release of all the claims, including the claims for replacement. But there were fraud claims in conjunction with that as well, so it's not just the cost of the boards and the replacement costs. It's also the fraud claims and the cost of defending and a number of different things. And there wasn't fraud claims. There were CPA claims. Well, yeah, CPA and UTA, U-T-P-A. Correct. And the other way that I think it's useful to look at this settlement that makes it make sense, to me anyway, is to put the shoe on the other foot. And there's a case that we cited, the in-search case out of the Fifth Circuit, and in that case the Fifth Circuit concluded that in that case and in its opinion almost in no case could you look at the settlement agreement itself to determine whether coverage existed. And with the in-search court, they were looking at this case from the opposite perspective, which is had Stimson drafted the same settlement agreement, but instead of having a formula that paid out the settlement the way they did, had a formula that said we'll pay $40 million attributable to other property damage and $10,000 attributable to replacing our boards, would the insurance companies be in here today saying, yep, that's all you need to look at. You don't need to look at what they alleged. You don't need to look at what the facts are. Just whatever happens to be the allocation that the parties picked in the settlement, that decides it all. They plainly would not. And that's what the Fifth Circuit recognized, that you just can't look at that because it doesn't reflect the underlying reality. It reflects ‑‑ Well, to me it's sort of analogous to when you're determining a duty to defend as opposed to a coverage decision. When you're determining the duty to defend, you look at the allegations. And a duty to defend is triggered if there's any possibility of coverage. But then when you look at the actual coverage determination, you have to look at precisely the event that's being sought, that coverage is being sought for. So I kind of look at this in an analogous fashion, that you started off with a global assertion of liability, and then you narrowed it down. But the record establishes that it never did get narrowed down. The settlement agreement in its first paragraphs recites that the class's claims are for both damages. Background them. But then you get the compensation formula, which in my view sort of narrows down, you know, Section 1.14a. It says the compensation shall be determined to me. That's damages. That's what, you know, the Stimson's paying for, shall be determined by reference to full replacement cost of removal and replacement of damaged board. Right. To me that's the bargain. You bargain for the damages. We bargained to pay that amount. But what we bought by agreeing to pay that amount was a release for both covered claims and uncovered claims. And so I don't, I guess my, I think it's a distraction to sort of look at what the compromise of the parties ultimately agreed upon to come up with a formula for paying out this claim and ignore what the payment was designed to achieve. But the parties have to live with the bargain that they actually made. And that's, I guess that's why I'm having some difficulty with your argument. Not just in this case, but in all, a lot of times we get cases that come before us and issues have been settled and the parties then still want to litigate those issues. And if you settle those issues, regardless of what the complaint said, and you can recite the complaint all you want, but, you know, once you settle them, you're stuck with the terms of the settlement. And that's why I'm having some difficulty with your argument. Well, I would just point out that there's, to my knowledge, and I don't believe any of the insurers have found a single case anywhere in the country that has said that in determining coverage for a settlement, that all you look at is the methodology for arriving at the figure and you ignore what was settled. The closest Ninth Circuit decision is the Pan Pacific decision, in which the district court had concluded that the settlement was designed to resolve uncovered deliberative claims. And the Ninth Circuit, on review, said, although there may have been minor damages, that they had to send it back to the district court for a factual determination as to whether or not any part of the payments in the settlement were designed to resolve covered claims. And so the same issue is true here. If any part of Stimson's incentive to pay what it did was designed not just to avoid claims that it settled for the siding, but also to resolve claims for other property, which claimingly did resolve, then it should be remanded back to the district court. But the next point, I suppose, that you could discuss is a wholly part of whether or not you decide that the only relevant feature is how you dole out the funds and not what was settled. Even then, coverage would still exist under Oregon law, because the settlement formula in the agreement provides for costs of not only replacing the siding, but costs of associated damage in the context of replacing the siding. Are you referring to wrapped paper, flashing, waste, overlap? Paint, trim, et cetera. So you say that's damage to other property? It's plainly – Stimson manufactures nothing but board. No other part of this system has anything to do with Stimson's property. They didn't install products. They didn't install it. They didn't make it. The Wyoming sawmills case, which is a governing Oregon Supreme Court law that's never been overturned, says that if in the process, in that case of the process of removing defective studs, damage was done to any other part of the – or you had to remove any other part of the building and replace it, coverage would exist for that, although not for the actual physical replacement of the studs. The insurers have had a number of cases from other jurisdictions reaching different results, but the Oregon Supreme Court's decision has never been overturned. It's still the law of the state. And there's Ninth Circuit opinions in other states that are comparable, like the Bawa decision out of Washington, which reaches the same results on – Well, as a practical matter, if we were to agree with you that there was damage to other property, how would that be apportioned in terms of coverage if there is – if the exclusion applies to the product, the damaged board, but not to the wrapped paper, et cetera? How would that be apportioned? I think it would have to be done the same way the Fourth Circuit did it in ABD – ABT, which is to have a factual determination as to what portion of the payment is attributable to the resolution of the covered claims and what portion of the payment is attributable to the resolution. And every claim that was paid out? I think it would be – I think it would be as to the – it would be treated, in my view, as though it was a lump sum. So whatever total amounts were paid in settlement, the portion of that total amount that would be attributable to covered claims – How much would you turn in that? You'd have to do some random sampling. You'd have to do it in a book. It would presumably be an expert-intensive endeavor, but certainly less complicated than other things that had to be proven. I'll reserve a few seconds for rebuttal here. Good morning. May it please the Court. I'm Jan Kitchell, and I represent Wausau Insurance. Although this case is entitled California Insurance, they are no longer party to the case. In reality, they're still on the books. I'm going to speak briefly and then turn it over to my co-counsel, Mr. Skinner and Mr. Gaylor. So I'll probably talk seven or eight minutes. I think that the Court has hit on one of the most important things in the case, and that's to look first at the settlement agreement. Of course, we have to look first at the insurance policy to find out what the policy covers. I think it bears note that the insurance policies cover property damage. It has to be accidental property damage. It has to be property damage that occurs during the policy period. And, of course, in this case we have a string of insurance companies that insure various policy periods. And then we have the your product exclusion, and then we have the settlement agreement. The settlement agreement, the Court's obviously looked at that pretty carefully already, so I can't add a lot to that, but it is carefully drawn. It has a definition of damage in the settlement agreement. The first thing that a claimant has to show, of course, is that they have the stems and siding, and then that the siding itself is damaged. And there are a whole lot of ways listed there that the siding can be damaged. It can swell. It can check, delaminate, swell around the nails. But all of those various descriptions of damage are only to the siding. If a claimant were to come in and say, well, the siding looks okay, but my studs underneath are rotten because water came through, they would have no claim. The settlement agreement doesn't provide for one nickel to anybody for damage to studs, as Your Honor mentioned. So the damage, first of all, has to occur to the siding. And then you go to the compensation formula. There really are two ways of getting compensation. One, if you have siding that hasn't yet been replaced, and then there's a formula based on how much of the siding is damaged. Or number two, if you have gone out ahead of time and done the work on the building to replace the siding, then you get reimbursed according to what you've spent. But you only get reimbursed for the cost of removing and replacing the siding. There's no provision in there for a nickel for replacing the studs. So there really is no way. Not for painting or replacing any flashing above at the very top. That's an important question. And I'm glad you got into that with Mr. Weiss toward the end of his argument. And that's something the court's going to have to look carefully at. The argument from the other side is that, well, the paint or the flashing or the trim is third-party property. We've cited several cases that say that if that damage to the paint or the flashing or the paper, which is obviously going to occur when you tear the siding off, is incidental to the actual removal and replacement of the siding, then it is part of your product exclusion and doesn't count as damage to third-party property caused by the siding. What's your strongest case? I think this was governed by Washington law. No, no. Thank you for bringing that out, Your Honor. This is going by Oregon law. Oregon law. What's the strongest case? I think the attorney's fees of Washington law. But what's the strongest case in Oregon that says if the other property is incidental to removal of your property, that it's not covered? The newest case, and the newest case that even discusses it at all, is the M.W. Builders case, which is a Ninth Circuit 2008 case arising out of Oregon with the same district judge, Judge Haggerty, that decided the summary judgments in our case here at Barr. Is there an Oregon State case? There is no real Oregon State case on point. There is, and the other side will want you to rely on the Wyoming sawmills case. The Wyoming sawmills case has been actually somewhat called into question by later Oregon cases because the statement in that case is dicta. In that case, Wyoming sawmills, we should remember that the insurance company won that case. There was found to be no coverage. Before you say that, the case that you're relying on, the M.W. Builders case? Yes, Your Honor. Did you say that was a district court case? No, that's a Ninth Circuit case. But it's unpublished. It is unpublished. And I think that we are allowed to cite those now post 2007. The Wyoming sawmills case has the statement of dicta in it because the court never actually faced that question, nor is it part of the holding. It was an offhand comment that's been relied on by Stimson in this case and called into question by Supreme Court Judge Kistler, I believe, in the later case of Schmidt. Also, Stimson relies very, very heavily on the ABT case, which I would argue to you is not a strong case for this issue. And the reason for that, which was actually called into question by the Fourth Circuit Court, is that at the trial level, the jury was instructed that the collateral damage that went along with the repairs was going to be covered, and the attorneys for the insurance company never accepted to that instruction. At the circuit court level, they pointed that out, that that instruction was never accepted to. Were you going to address the Consumer Protection Act and Unfair Trade Practices Act claims? I could if you'd like me to. Well, the only question I have is if we affirm that decision, does that get rid of the case? If we affirm a district court's ruling that those were based or intentional and not covered by the policy, does that get rid of this entire case? It gets rid of any duty to defend. I think that the duty to defend the case and the actual damages in the case are really two different questions. So I think that there are --. Why would that, picking up on what you just said in response to Judge Rollinson's questions, why would that eliminate the duty to defend? If the ‑‑ and we believe that the consumer ‑‑ well, the judge ruled at the district court level that there was no duty to defend because it is a case that's essentially based on allegations of deceit and fraud. And under Oregon law, under the Cunningham and Walsh case and the Drake case, if the allegations are of deceit, it carries with it the implication that the damage is intended. Not that the siding go bad, but the intended damage is that the other party go through with the contract and complete the sale. Well, as a practical matter, what that means is that the defense costs should not be ‑‑ I mean, because you've already defended, right? We defended up until the court ruled we had no duty to defend. And so what's at issue is ‑‑ And then 20 days later, the case, the settlement was entered in the Gardner class action. You were not involved in the settlement of this case? No, Your Honor. It settled without you being involved. Stinson did it on their own. Stinson did it on their own. And so what's at issue is the costs that were between the time the district court made its ruling and the time of the settlement. So that's what we're talking about. And then there would be some defense costs following settlement because it doesn't just end on a dime at that point. Right, exactly. But you're not talking about the pre-settlement defense costs. We're talking about the costs that were incurred after the district court made the ruling on the duty to defend. Yes, Your Honor. And what about the apportionment of defense costs to Stinson? What's your position on that? The cases that we've cited, kind of the seminal cases, the 48 installations case, and then there are a lot of other cases around the country, including the Burnett case in Oregon, that says you can apportion defense costs between insurance companies and to the insured for portions of time that are not covered. They had coverage in those gap periods, right? Well, yes and no. They had coverage. You just the companies went. What's interesting to note here is that they didn't have coverage after 2000 at all. They didn't attempt to buy coverage. So there is a large portion of the time period from 2000 on where they had no coverage simply because there wasn't any purchased. There was not any purchased? No. There was a period of time where they did not purchase any insurance. What period of time is that? From 2000 until the present. March of 2000, I believe. The four-year period where the home insured them but went under was in the 90s. But what period did the district court apportion defense costs to Stinson? Was it just during the period where they had no insurance or was it also during the period where the defunct insurance company was covering? There has been no ‑‑ the statement has been made by the district court that it should be apportioned but no actual math has been done. My impression was he was contemplating ‑‑ well, I don't know. I take that back. I'm not sure. It actually would be a claim back by the insurance companies for monies that they paid. It strikes me a bit odd, though, that the insured, if they had insurance and their insurance company goes defunct for some reason, that they would then be saddled for that period of time. It bears note that they have not appealed the judge's ruling that they are stuck with their own damages that occurred during that time. They've only appealed the judge's ruling that the defense costs should not be apportioned to them at that time. Well, that's because the other insurance companies had a duty to defend the entire action anyway. I think the best approach to that, Your Honor, has been pointed out by several cases that the insurance companies should make an effort to make sure there is a good defense. So, in other words, if someone needs a defense, the insurance companies probably front that, as they did in this case, but then they may have an entitlement to get it back from a solvent insured if it turns out, once the case is over, as this one is over now for all practical purposes, that there was a time in which there was no coverage. If you want to share some time with your colleagues, you should do it now. I would like to, Your Honor. We hope that you consider all the arguments in our brief and affirm. Thanks. Good morning. My name is Steve Skinner, and I represent Access Insurers, ISOP, and National Union. And I'll try to keep my comments brief because I know we're running short on time. As a preface to my comments, Access Insurers are different than primary insurers. They generally accept smaller premiums because the risks they undertake are more remote. The excess risk reflects the fact that there may be an underlying primary policy that may provide a defense as well as indemnity. The drop-down and horizontal exhaustion issues address policy language intended to preserve the excess status of ISOP and National Union and enforce the contracts they entered into as access insurers. First, briefly, with respect to the horizontal exhaustion issue, the trial court determined that the primary policies would need to be exhausted on a horizontal plane before any excess insurance provided by ISOP and perhaps National Union would be triggered. That ruling should be affirmed. Interestingly, Stimson's says it does not oppose horizontal exhaustion per se on appeal. However, it proposes a modification to the trial court's ruling by suggesting that horizontal exhaustion be limited to individual policy years. This argument, which was never made in the trial court, would eliminate the horizontal aspect of the horizontal exhaustion. How would that work in practice? How would that work? How would Stimson's proposal work? Well, if you look at the case law that they cited, including mayor and city council of Baltimore, what they seem to be suggesting is in periods where you have lower primary limits, then perhaps the excess policy in those years would be triggered prior to excess layers in other policy years. First of all, I would point out that the Baltimore case that they cite in their reply brief really stands for the proposition that the horizontal exhaustion rule should be applied, and it identifies situations where vertical exhaustion is going to be applied, where the excess policy specifically ties itself to a specific primary policy. That is not the case here. The ISOP policies make themselves excess to all underlying policies. Secondly, this is not a case in which we've got sort of a jagged line of coverage. As far as I know, we've got a $1 million primary layer all the way across, so this is not a situation where there's some lower primary limits in some years, and the excess insurer arguably accepted a lower attachment point in those years. That's not the case. So for that reason, the horizontal allocation ruling of the court should be affirmed. I just want to speak briefly about dropdown, which addressed the insolvency of the home insurance company. Stimson attacks the limit of liability provision contained in the ISOP policies and claims that one word applicable is ambiguous. Citing the Hoffman construction analysis, and interestingly also a case which addresses this specific issue, the limit of liability provision in this case is not ambiguous, and the reliance on the strained interpretation of applicable fails the context test set forth in Hoffman because it effectively guts the limit of liability provision. Section A would basically cover any situation where Section B would no longer be relevant to any necessary issue that came up. So in closing, we request that the trial courts for rulings on the dropdown and horizontal exhaustion issues be affirmed. I would further note that these issues are secondary in the sense that if there is no coverage for the underlying disputed siting claims, then the court need not address these issues. Thank you. I'll give you a minute or two here to say what you wanted to say. Yes, Your Honor. May it please the Court, Barry Gaylor, Counsel for American National Fire Insurance, and I will take just a minute or so to make two points. And the two points are as far as the case law on damage to other property, the Stimson has referred to the Wyoming sawmills case as well as a whole bunch of other cases talking about this doctrine. All of those cases trace their genesis back to a 1954 Minnesota Supreme Court case called Hallenstein. And since that time, the Hallenstein case has basically been effectively repudiated. It's based on different policy language, and the Minnesota Supreme Court itself has basically backstepped away from that case. The main case is the Vieira case that's been cited both by Judge Hagerty and then also in the briefs of the parties. And that's really the primary case to look at to really understand that doctrine. The second point I'd like to make is with respect to the settlement agreement, Stimson has cited to the Pan Pacific case. And it's critical to distinguish here, as we've gone through at length, the settlement agreement terms are important, but also the Pan Pacific case looked at actual facts. And there was evidence in the record of a covered claim. In that case, it happened to be a $10,000 value of information that was real live evidence that was presented to the court where the court could look at the settlement agreement and say some portion of the settlement involved a covered claim. In this case, Judge Hagerty went through the record and couldn't find any evidence of a covered claim. And there's two things that Stimson cited to say that there's evidence of secondary property damage. The first thing is a statement from the class counsel, which is basically he's not an expert. He didn't make observations and expert conclusions about damage to property. It's basically his spin trying to tell Stimson and their insurers that they had some exposure. The second thing that they cite to is a declaration from their expert, Dennis Govan. And Mr. Govan is an architect who made observations and essentially said Stimson's product isn't defective and it didn't cause this secondary property damage. In order to have liability, there must be a legal obligation to pay damages for property damage that is not Stimson's own product. And the Govan declaration essentially says there's no legal liability. So that obviously can't support a covered claim. So with that, I'd ask to reiterate what my colleagues have said and ask that the Court affirm. All right. Thank you. You've got a minute. I will be rapid then. The first point I want to make, someone pointed out that the insurers weren't involved in the settlement. The record at ER 114 establishes that they agreed to the settlement. That's not contradicted. But it's different than being involved. That's correct. But they consented to it, which is my point. The second point I would like to make relates to defense costs, pointing out that the Burnett decision that they claim supports their notion that Stimson ought to have to pay for its own defense, even though all the insurers each agreed to pay for the entire defense under Oregon law. Was Stimson uninsured for those years, 2000 and 2004? Well, you know, honestly, I don't know if that's true or isn't true, but Stimson discontinued making force tax in 1997. So in any event, whether they have coverage for the force tax claims three years after they stopped selling it, it's probably not relevant to anything. Burnett just deals with contribution actions among insurance companies. Contribution, by definition, is a means of allocating responsibility between jointly responsible parties. Stimson isn't one, so it's irrelevant here. And the cases that we cite are consistent with that. Just a note on the UPTA claims, none of those claims are not fraud claims, and none of them have the same elements as fraud. Almost all of them, six of them, require no intent to injure at all and impose liability for making statements that could deceive or have the capacity to deceive regardless of whether there's an intent to deceive. So it's very different. All the underlying claims were fraud claims and not fraud claims, but the... The only underlying claims and fair trade practices claims are Consumer Protection Act claims, none of which, none of the states at issue required an intent to cause harm. So it's not analogous to the fraud claims that they rely on. And there were no warranty claims or... Not by the time it got settled. Okay. Years were covered by the settlement. The settlement covered all damage at all times related to the sales force tax siding, which had been discontinued, you know, almost a decade, well, eight years before the settlement was reached. I thought that the... 2004. You may be correct. I'm sorry I didn't bring the settlement agreement up to the podium with me, but in any event, there hadn't been siding settled for eight years, so... Okay. Thank you very much. We appreciate everybody's arguments this morning. That case will be submitted, and that ends our session for the day and for the week, so...
judges: Paez, Rawlinson, Collins